UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL DOSENBERRY,

          Petitioner,                         Hon. Janet T. Neff

v.                                          Case No. 1:12-CV-1359

CARMEN PALMER,

          Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Dosenberry's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Dosenberry's petition be **denied**.

**BACKGROUND**

        As a result of events which occurred in March 1993, Petitioner was charged with open murder. (Trial Transcript, February 2, 2009, 30). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Todd Sjoerdsma**

Andrew and Phyllis Sjoerdsma adopted three children, Todd Sjoerdsma, Randy Sjoerdsma, and Amy Sjoerdsma.  (Trial Transcript, February 2, 2009, 190).  Randy Sjoerdsma suffered from a learning disability.  (Tr. 191).  When Randy Sjoerdsma was 19 or 20 years old he was struck by a car which severely injured his leg causing him to walk with a permanent limp and rely on a plastic leg brace.  (Tr. 192-93).

**Bryon Rhamy**

Rhamy met Randy Sjoerdsma in 1992.  (Trial Transcript, February 2, 2009, 210).  Sjoerdsma often visited the bar where Rhamy then worked.  (Tr. 210-11).  Rhamy last saw Randy Sjoerdsma on a Saturday in the spring of 1993.  (Tr. 211-12).  The pair ran into each other at Rocky's bar in Grand Rapids.  (Tr. 211-12).  Rhamy did not see Sjoerdsma's wallet, but Rhamy did notice that Sjoerdsma had a "thick" envelope full of money.  (Tr. 214-15).  Rhamy and Sjoerdsma spent approximately 30 minutes together at which point Rhamy exited the bar.  (Tr. 215).

**Jeff Kesse**

As of March 21, 1993, Kesse resided in Dorr, Michigan.  (Trial Transcript, February 3, 2009, 7-8).  Late that morning, on a "very very rural gravel road" near the intersection of 143rd Street and Kalamazoo Avenue in Allegan County, Kesse observed "a new tennis shoe in the road." (Tr. 7-8, 17, 30).  Kesse stopped his vehicle "to see if maybe there was another [shoe]."  (Tr. 8). Kesse exited his vehicle and began to search the area when he "noticed a lot of blood and stuff down the bank."  (Tr. 9).  Specifically, Keese observed "a lot of blood and clothing and debris in a 10 to

2

15 foot diameter area. . .about 15 foot off the road or so, down the ravine." (Tr. 9-10).  The clothing appeared to have been burned.  (Tr. 12).  There was only one house in this general area and it was located "probably 600 feet off the road."  (Tr. 10).  As Kesse and his wife were examining the area, they observed a wallet.  (Tr. 13-14).  Kesse retrieved the wallet and immediately drove to the Wayland State Police Post.  (Tr. 14-15).  Kesse surrendered the wallet and reported what he saw. (Tr. 15).  Approximately four hours later, a police officer requested to meet with Kesse at the location where he discovered the wallet.  (Tr. 15, 29).[1]

**Ellen Hudson**

On a Friday afternoon in 1993, Petitioner, Ryan Thibodeaux, Randy Sjoerdsma, and some other people visited Hudson's residence to purchase marijuana.  (Trial Transcript, February 3, 2009, 40-46).  Hudson observed that Randy Sjoerdsma "had quite a bit of money in his wallet." (Tr. 37-38).  Petitioner told Hudson that he had just taken Sjoerdsma to cash his Social Security check and he, Sjoerdsma, Thibodeaux, and some other people were "going to go party."  (Tr. 39-41). Petitioner told Hudson that he and Thibodeaux "were not going to let Randy out of their sight."  (Tr. 40-41).  Shortly after this encounter, Hudson was interviewed by the police by which time Randy Sjoerdsma "had disappeared."  (Tr. 38-39, 46-48).

---

[1]  This location was subsequently determined to be a crime scene and will, therefore, be referred as such going forward.

**Patrick O'Reilly**

O'Reilly, a Detective with the Allegan County Sheriff's Department Cold Case Team, presented a video which depicted the then current view of the crime scene Jeff Kesse originally discovered. (Trial Transcript, February 3, 2009, 32-34, 53-62).

**James Campbell**

As of September 9, 2008, Campbell was employed as a "traffic crash reconstructionist" for the Michigan State Police. (Trial Transcript, February 3, 2009, 63-65). On this date, he assisted county law enforcement officials by creating a map of the the crime scene Jeff Kesse originally discovered. (Tr. 65-81). The map Campbell created was presented to the jury. (Tr. 65-81).

**Ronald Neil**

On March 21, 1993, Neil, who was then a Lieutenant with the Michigan State Police, was dispatched to investigate the crime scene that Jeff Kesse discovered earlier that day. (Trial Transcript, February 3, 2009, 82-86). An examination of the area just off the roadway revealed "a great amount of disturbance" as if someone had rolled or slid down the embankment. (Tr. 91-92). Neil observed "numerous areas" with a "red substance" he perceived to be blood. (Tr. 92). Neil discovered "pieces of hair that appeared to be human" attached to which was "what [he] recognized as skin." (Tr. 92). Neil discovered a lighter, a small can of lighter fluid, a watch, and articles of clothing "that appeared to be burned." (Tr. 92-93, 96). Neil also discovered a velcro strap which he later learned was used to secure a foot brace. (Tr. 94).

4

Neil was also provided a wallet that had been recovered from the scene.  (Tr. 95). After examining the identification therein, Neil contacted Andrew Sjoerdsma.  (Tr. 95-96).  Andrew Sjoerdsma was able to identify the watch discovered at the crime scene as belonging to Randy Sjoerdsma.  (Tr. 96).  The description by Andrew Sjoerdsma of the footwear that Randy Sjoerdsma was last wearing matched the shoe that Neil recovered from the crime scene.  (Tr. 96).  Andrew Sjoerdsma also informed Neil that Randy Sjoerdsma wore a leg brace as a result of his leg injuries. (Tr. 96).  According to Andrew Sjoerdsma, as of March 21, 1993, Randy Sjoerdsma lived "above a bar called Rocky's Lounge."  (Tr. 98).

On April 16, 1993, Neil spoke with Petitioner.  (Tr. 100).  Petitioner indicated that he met Randy Sjoerdsma when the two worked together at a local restaurant.  (Tr. 100).  Petitioner also indicated that he, Sjoerdsma, and Danielle Burrows lived together for "a short period of time, maybe like a month."  (Tr. 100-03).  Petitioner indicated that he and Sjoerdsma were friends and he "expressed some interest in wondering what had happened to him, that he didn't know."  (Tr. 101). Neil asked Petitioner if he was familiar with the area in Allegan County near the intersection of 143rd Street and Kalamazoo Avenue.  (Tr. 101).  Petitioner responded that "he didn't even know where Allegan County was."  (Tr. 101).

When asked if he "had any idea where Randy was," Petitioner "had no response or no idea what happened."  (Tr. 101).  Petitioner indicated that he last visited with Sjoerdsma in "the first part of March" when he and Ryan Thibodeaux went to see Sjoerdsma at his apartment above Rocky's Lounge.  (Tr. 108-09).  Petitioner was aware that Sjoerdsma received "some kind of disability check."  (Tr. 105).  As of April 1993, Petitioner was under 21 years of age.  (Tr. 104). Randy Sjoerdsma, however, was over age 21 and would purchase alcohol for Petitioner.  (Tr. 104).

5

Neil interviewed Petitioner again in June 1993, by which time Randy Sjoerdsma's body had been recovered. (Tr. 106, 112-13). When asked about his whereabouts on March 20, 1993, Petitioner stated that he was with Jack Phillips. (Tr. 106). Petitioner specifically denied associating with Ryan Thibodeaux on that date. (Tr. 106-07). Petitioner indicated that he learned of Randy Sjoerdsma's disappearance from Jack Phillips. (Tr. 109). At this latter interview, Petitioner indicated that he had learned, from Jack Phillips, that one of Randy Sjoerdsma's shoes had been recovered. (Tr. 109). This was a detail that had not, at that juncture, been released to the public. (Tr. 109).

Petitioner stated to Neil that he thought Sjoerdsma was "a drunk" and, moreover, that he was gay. (Tr. 110). Petitioner described an incident where he, Sjoerdsma, and others had "gone to sleep or passed out" after a party. (Tr. 110). Sjoerdsma subsequently "either rolled over or reached over and touched [Petitioner's] person" while "physically touching his own person in the genital area." (Tr. 110-11). Petitioner conceded that some of their friends "kidded" him about the incident, but Petitioner asserted that "it wasn't that big of a deal." (Tr. 111).

**Mike Simonds**

As of January 2009, Simonds was employed as a Sergeant with the Allegan County Sheriff's Department. (Trial Transcript, February 3, 2009, 159). On two occasions during January 2009, Simonds recorded video footage of the crime scene which was presented to the jury. (Tr. 159-66).

6

**Tom Spaman**

As of March 21, 1993, Spaman was employed as a Michigan State Trooper.  (Trial Transcript, February 3, 2009, 171-72).  That evening, Trooper Spaman was dispatched to investigate the crime scene Jeff Kesse discovered.  (Tr. 173).  Spaman arrived at the scene at approximately 7:15 p.m.  (Tr. 173).  Spaman characterized the location as "a secluded place."  (Tr. 205).  An examination of the crime scene and the immediate vicinity revealed the presence of blood.  (Tr. 188).  In his discovery of the crime scene, Spaman recovered the following items: (1) a shoe; (2) a white sock; (3) numerous pieces of burnt cloth; (4) a shoe insert; (5) a piece of Velcro; (6) a set of keys; (7) a Marlboro cigarette butt; (8) a Basic cigarette butt; (9) a red butane lighter; and (10) a can of lighter fluid.  (Tr. 184-211).

**Peter Paul Pitt**

As of 1993, Pitt lived in Caledonia, Michigan near the Thornapple River.  (Trial Transcript, February 3, 2009, 231).  During Memorial Day weekend 1993, Pitt was fishing in the Thornapple River when he observed "what looked like a body floating in the water."  (Tr. 232).  Pitt's father immediately contacted the police.  (Tr. 233-34).

**Jerry Medema**

As of May 29, 1993, Medema was employed as a Detective Sergeant with the Kent County Sheriff's Department.  (Trial Transcript, February 4, 2009, 33).  On that day, Medema was dispatched to investigate a report of a body discovered floating in the Thornapple River.  (Tr. 33-35).  The body was subsequently identified as Randy Sjoerdsma.  (Tr. 36-37).  Dr. Stephen Cohle

subsequently performed an autopsy on Sjoerdsma's body.  (Tr. 38).  As part of his investigation, Medema spoke with Petitioner on several occasions over the course of "several years." (Tr. 41-42).

Petitioner acknowledged that he knew and occasionally associated with Sjoerdsma. (Tr. 43).  Petitioner also indicated that he, Sjoerdsma, and Danielle Burrows briefly shared a residence from December 1992 through January 1993.  (Tr. 48-49).  Petitioner indicated that "one of the reasons" he and others liked Sjoerdsma was that Sjoerdsma would purchase alcohol for them and provide them with marijuana.  (Tr. 49).  Petitioner described Ryan Thibodeaux as a "good" friend.  (Tr. 43).

Petitioner maintained that he "was not involved personally" in Sjoerdsma's death. (Tr. 42).  Petitioner stated that he was with Jack Phillips on the weekend that Sjoerdsma disappeared. (Tr. 44).  Petitioner denied being with Ryan Thibodeaux during this time.  (Tr. 44).  Petitioner was asked about a "groping" incident with Sjoerdsma.  (Tr. 55-57).  Petitioner responded that he "didn't really recall anything of the groping" because "he was passed out at the time."  (Tr. 57).  Petitioner stated that he learned of the incident from others.  (Tr. 57).

**Dr. Stephen Cohle**

Dr. Cohle performed the autopsy on Randy Sjoerdsma.  (Trial Transcript, February 4, 2009, 70).  The autopsy revealed that the hyoid bone in Sjoerdsma's neck was fractured at "each end" suggesting that he suffered "some pressure or trauma to the neck."  (Tr. 78).  The doctor discovered that the perineum, the area between the scrotum and the anus, suffered a one and one-half inch laceration suggesting that "there was some severe blunt trauma to that region." (Tr. 78).  An examination of the liver revealed that it "was almost cut in half" from "some type of severe blunt

force over the upper abdomen." (Tr. 79).

An examination of the lining of the rectum revealed the presence of "extensive hemorrhage." (Tr. 80). The doctor determined that this did not result from any disease or natural process, but instead resulted from either the injury to the perineum or, "more likely," the insertion into the rectum of a foreign object. (Tr. 80-82). The nature of this particular injury indicated that it was inflicted prior to death. (Tr. 85). The doctor identified Randy Sjoerdsma's cause of death as a lacerated liver. (Tr. 81).

**Toni (Horton) Bellgraph**

Bellgraph met Petitioner in 1988 when she was twelve years of age. (Trial Transcript, February 4, 2009, 109-10). When Bellgraph was 14 or 15 years old, she began dating Petitioner. (Tr. 110). The two dated until early 1995. (Tr. 110). During their relationship, Bellgraph gave Petitioner a zippo lighter. (Tr. 129-30).

Bellgraph was first contacted by the police in March 1994. (Tr. 117). Bellgraph told the police that on the night of March 20, 1993, Petitioner had been with her. (Tr. 117-18). Bellgraph later realized that she had been mistaken in this regard. (Tr. 119). Bellgraph later asked Petitioner what happened to Randy Sjoerdsma on the night of March 20, 1993. (Tr. 120). Petitioner initially refused, but after Bellgraph "kept pressuring" him, Petitioner "finally" told Bellgraph what happened. (Tr. 120). Petitioner told Bellgraph that

> him and Ryan [Thibodeaux] had to go pick up Randy in Wayland
> from a bar, he needed a ride, and that Ryan and Randy got into an
> argument over something with the purchase of beer, who was buying
> beers, something to that extent, and that Ryan had gotten physical
> with Randy and beat him pretty much to death, he died, and they

> panicked, drove around and went to find somewhere to dump him in
> the river.

(Tr. 120-21).


**Danielle Burrows**

From December 1992 through January 1993, Burrows shared a residence with Petitioner and Randy Sjoerdsma.  (Trial Transcript, February 4, 2009, 146-47).  During this time Petitioner and Burrows were involved in a sexual relationship.  (Tr. 147).  Burrows described an incident between Petitioner and Sjoerdsma that occurred in early January 1993.  (Tr. 149).

Burrows entered the residence and observed Petitioner passed out on a bed with Sjoerdsma next to him. (Tr. 149).  Sjoerdsma "had his hand on [Petitioner's] belly and then his other hand on his private area with his pants down."  (Tr. 149).  Burrows immediately tried to pull up Sjoerdsma's pants and cover him up with a towel.  (Tr. 150-51).  She then "stuck some pillows between them."  (Tr. 150-51).  There were in the residence at that time several other people.  (Tr. 152).  Burrows was "sure" that the incident between Petitioner and Sjoerdsma circulated among their friends.  (Tr. 154-55).


**Robert Martin**

In 1994, Martin met Jack Phillips at a local restaurant where they both worked.  (Trial Transcript, February 4, 2009, 182-83).  Through his association with Phillips, Martin began hanging out with Petitioner and several of his friends.  (Tr. 183-84).  On one particular occasion, approximately one year after meeting Petitioner, Martin asked Petitioner about Randy Sjoerdsma.

(Tr. 185, 190).  Petitioner responded that "it was taken care of" at which point "he just got quiet."

(Tr. 185).  Several minutes later, Petitioner described what happened to Sjoerdsma.  (Tr. 185).

Specifically, Petitioner indicated that:

> him and Ryan [Thibodeaux] got a bottle of Jim Beam, picked up
> Randy, went cruising on the back roads, him and Ryan beat Randy's
> ass, Ryan stomped and kicked him and Ryan beat him in the head
> with the bottle and then they threw him in the river.

(Tr. 186).


**Danielle Mullins**

Mullins attended high school with Petitioner and the pair associated with the same

general circle of friends.  (Trial Transcript, February 4, 2009, 202-03).  Mullins also knew Randy

Sjoerdsma as he was a distant relative by marriage.  (Tr. 203).  In the aftermath of Randy

Sjoerdsma's killing Mullins knew only that Sjoerdsma "was missing and that he was found."  (Tr.

205).  Approximately 5 or 6 years later, Mullins saw Petitioner at a bowling alley and overheard a

conversation he was having with Ryan Thibodeaux and several other people.  (Tr. 205-08).

Specifically, Mullins overheard Petitioner say:

> Something about they had this guy and things had went too far.  They
> did some things to him like shoved a glass up his ass, said that he was
> a fagot, basically they were showing him what a real fagot was.
> Something about putting cigarettes out in his eyes or something on
> that order.

(Tr. 209).

11

**Ken Daniel**

As of March 22, 1994, Daniel was employed as a Detective Sergeant with the Michigan State Police.  (Trial Transcript, February 5, 2009, 2-5).  On this date, Daniel interviewed Petitioner about Randy Sjoerdsma's murder.  (Tr. 5).  At this time, Petitioner denied any involvement in the matter.  (Tr. 5).

On April 18, 1997, Daniel again spoke with Petitioner.  (Tr. 6).  Petitioner indicated that he and Sjoerdsma had been friends, but also stated that "you don't want to drink after [Sjoerdsma], you might pick up some nasty disease or something."  (Tr. 17).  Petitioner also stated that he and Ryan Thibodeaux were friends.  (Tr. 18).  During this interview Petitioner asserted that he was with his then girlfriend, Toni Horton, on the night of Sjoerdsma's murder.  (Tr. 39).

Daniel interviewed Petitioner a third time on May, 19, 2000.  (Tr. 32).  During this interview, Petitioner conceded he was with Thibodeaux and Sjoerdsma on the night of Sjoerdsma's murder.  (Tr. 39).  During this interview, Petitioner described "Ryan Thibodeaux's actions of using his feet to stomp on the body of Randy Sjoerdsma."  (Tr. 41).[2]

**Fred McCormick**

As of June 17, 2008, McCormick was an inmate in the Allegan County Jail.  (Trial Transcript, February 5, 2009, 76).  McCormick met Petitioner on this date, when Petitioner was placed in the same cell block.  (Tr. 76).  McCormick and Petitioner soon became friends.  (Tr. 77). At some point, Petitioner shared with McCormick some of the details of Randy Sjoerdsma's murder.

---

[2]  It is difficult to discern specifics from this interview because it was tape recorded and played for the jury. While Daniel testified to certain aspects of the interview, a transcript of such is not contained in the record.

12

(Tr. 78).  McCormick related Petitioner's comments to him thusly:

> He told me that the guy in question that has been murdered, that he ejaculated on him and him and his buddies took him out to rough him up and then his buddy [Ryan Thibodeaux] got out of control and then the gentleman that was murdered got sodomized and that they threw him in the trunk of a car and took him to a river and him in the - or took him to an overpass and threw him in the river.

(Tr. 78-80).

Petitioner indicated to McCormick that he participated in the killing of Randy Sjoerdsma because of a prior incident in which Sjoerdsma "ejaculated on him."  (Tr. 89-90).


**Scott Beckman**

As of September 2, 2008, Beckman was employed as a Lieutenant with the Wyoming Police Department.  (Trial Transcript, February 5, 2009, 102-05, 113).  On this date, after normal business hours, Detective Pat O'Reilly and Trooper Scott Ernstes requested to use an interview room at the Wyoming Police Department to conduct an interview with Petitioner.  (Tr. 105-07).  Beckman soon thereafter arrived at the police station to provide O'Reilly and Ernstes access to the facility.  (Tr. 108).  Beckman escorted O'Reilly and Ernstes to the interview room, turned on the audio/video recording equipment, and then proceeded to his office to work.  (Tr. 108).  Beckman did not watch or participate in the interview of Petitioner.  (Tr. 108).  Beckman was later informed that there were "problems with the audio portion" of the interview of Petitioner.  (Tr. 110).  The video portion of the interview recorded without mishap.  (Tr. 119).

13

**Mike Henry**

As of September 5, 2008, Henry was employed as a service technician for Mid-State Security.  (Trial Transcript, February 5, 2009, 125-27).  On this date, Henry was dispatched to the Wyoming Police Department in response to a complaint that the audio recording system that Mid-State previously installed was not working properly. (Tr. 127-28).  Specifically, Henry was informed that the audio "was cutting in and out."  (Tr. 128).  In response, Henry increased the sensitivity of the system's voice activation capabilities.  (Tr. 128-30).  On September 22, 2008, Henry returned to the Wyoming Police Department in response to a complaint that "they were still having interviews where there was at least partial audio problem."  (Tr. 132-33).  In response, Henry "maxed out" the voice activation settings.  (Tr. 132-33).  Henry was not aware of any difficulties with the audio recording system following this latter service call.  (Tr. 133).

**Patrick O'Reilly**

As of April 2008, O'Reilly was a Detective with the Allegan County Sheriff's Department.  (Trial Transcript, February 5, 2009, 136-37).  In April 2008, O'Reilly was assigned to participate in the "cold case team" with several other law enforcement officers.  (Tr. 137-39).  The cold case team subsequently decided to examine the killing of Randy Sjoerdsma.  (Tr. 142).  After reviewing the case file, the determination was made to speak with Petitioner.  (Tr. 142-45).

On September 2, 2008, Detective Werkema and Trooper Ernstes made contact with Petitioner at his residence while O'Reilly, Lieutenant Matice, and Officer Giles watched from a police vehicle parked across the street. (Tr. 145-46).  Werkema and Ernstes soon thereafter informed O'Reilly that Petitioner agreed to "come with them for an interview at the Wyoming Police

14

Department." (Tr. 146-47).  The officers chose the Wyoming Police Department as the location for the interview because it was close to Petitioner's residence and "just more convenient." (Tr. 147). O'Reilly immediately proceeded to the Wyoming Police Department so that he could "make sure that the interview room was set up and that the recording equipment was functioning" before Werkema and Ernstes arrived with Petitioner.  (Tr. 147-50).

O'Reilly did not participate in the interview of Petitioner, but he did observe "the bulk of it." (Tr. 150).  During the interview, Petitioner acknowledged "that there was a plan to take Randy out, beat his ass, and leave him." (Tr. 156-58).  Petitioner indicated that "the plan" was precipitated by "an alleged allegation that the victim in this case had masturbated on him and that he had received some ridicule as a result of that." (Tr. 156-58).  Petitioner indicated that after reaching a "secluded area," Ryan Thibodeaux "pulled [Randy] Sjoerdsma out of the back seat and began to assault him." (Tr. 160).  According to Petitioner, Thibodeaux began "stomping" Sjoerdsma. (Tr. 160).  Petitioner, "at some point," heard Sjoerdsma "gurgling." (Tr. 160).

The gurgling soon stopped at which point Thibodeaux "dragged" Sjoerdsma into the ditch. (Tr. 162).  Thibodeaux then returned to the vehicle and retrieved Petitioner's lighter and lighter fluid. (Tr. 162).  A "short time" later, Petitioner "witnessed a poof." (Tr. 162).  Thibodeaux then returned to the vehicle and stated, "he won't burn, we can't leave him here." (Tr. 162-63). Thibodeaux asked Petitioner "for assistance in getting him back out of the gully and into the car." (Tr. 163).  Before Petitioner and Thibodeaux departed the area, Petitioner smoked a cigarette "while standing up by the road." (Tr. 165).

15

**Scott Matice**

As of September 2, 2008, Matice was employed as a Lieutenant with the Allegan County Sheriff's Department.  (Trial Transcript, February 9, 2009, 4-7).  On this date, Matice assisted Detective O'Reilly and Officer Giles with surveillance of Petitioner's residence.  (Tr. 7-8).  Matice observed Detective Werkema and Trooper Ernstes make contact with Petitioner.  (Tr. 8-9).  Shortly thereafter, Matice, O'Reilly, and Giles proceeded to the Wyoming Police Department.  (Tr. 10).  Matice did not participate in the subsequent interview of Petitioner, but instead observed from a "monitoring room."  (Tr. 11-13).

During his interview, Petitioner related that on the night in question he and Ryan Thibodeaux were riding around and drinking with Randy Sjoerdsma.  (Tr. 20-21).  Petitioner and Thibodeaux had previously developed a plan to "have a fight with Randy Sjoerdsma and that they were going to leave him after the assault occurred."  (Tr. 20).  At some point the group stopped at which point Thibodeaux "began assaulting Randy outside of the vehicle." (Tr. 21).  Thibodeaux then retrieved Petitioner's lighter and lighter fluid and attempted to burn Sjoerdsma's body after which Petitioner helped Thibodeaux move Sjoerdsma's body into their vehicle.  (Tr. 21-24).  During the interview, Petitioner mentioned that "there might have been a masturbating incident" where Sjoerdsma masturbated on him.  (Tr. 23-24).  Petitioner "d[id] not recall that happening, he just was told about that later on that it happened."  (Tr. 24).

**Mark Giles**

As of September 2, 2008, Giles was employed as a police officer with the Saugatuck/Douglas Police Department.  (Trial Transcript, February 9, 2009, 41-42, 53).  Giles was

part of the cold case team investigating the killing of Randy Sjoerdsma.  (Tr. 41-42).  In this capacity, Giles assisted Lieutenant Matice and Detective O'Reilly with surveillance of Petitioner's residence on September 2, 2008.  (Tr. 42-44).  Giles observed Detective Werkema and Trooper Ernstes make contact with Petitioner who voluntarily entered their vehicle.  (Tr. 43-44).  Shortly thereafter, Giles, Matice, and O'Reilly proceeded to the Wyoming Police Department.  (Tr. 44-45). Giles did not participate in the subsequent interview of Petitioner, but instead observed from an adjacent room.  (Tr. 46-49).

During the interview, Petitioner was asked "if he had knowledge of what was going to happen to Randy [Sjoerdsma]."  (Tr. 51).  Petitioner responded that "he did know that Ryan [Thibodeaux] was going to go out and 'beat his ass' and that they were going to then leave him out somewhere."  (Tr. 51).  Petitioner indicated that he was not sure if Sjoerdsma was actually dead when they threw his body into a river.  (Tr. 51-52).

**Scott Ernstes**

In July 2008, Ernstes, a Michigan State Trooper, began working on the cold case team investigating the killing of Randy Sjoerdsma.  (Trial Transcript, February 9, 2009, 62-64).  On the evening of September 2, 2008, Ernstes and Detective Werkema proceeded to Petitioner's residence. (Tr. 87-88, 128).  Petitioner agreed to participate in an interview and the group proceeded to the Wyoming Police Department.  (Tr. 88-89).  On the way to the police station, the group stopped at a Burger King so that Petitioner could get something to eat.  (Tr. 89).

Once they arrived at the police station, Ernstes, Werkema, and Petitioner proceeded to an interview room.  (Tr. 90, 104).  The interview of Petitioner lasted approximately 140 minutes.

17

(Tr. 91-92).  Petitioner was not restrained in any way during the interview.  (Tr. 92).  Ernstes was wearing jeans and a t-shirt.  (Tr. 92).  Ernstes was armed, but his firearm was secured under his shirt and was not visible.  (Tr. 92).  Ernstes did not see a weapon on Detective Werkema's person.  (Tr. 92).  Ernstes tested the audio recording system before beginning the interview and determined that it was working properly.  (Tr. 92-95).  He later learned, however, that while the video recording of the interview was properly recorded the audio portion was properly recording only intermittently.  (Tr. 92-95).

Petitioner stated that on the evening of March 20, 1993, he and Ryan Thibodeaux were hanging out when they received a call from Randy Sjoerdsma.  (Tr. 108-09).  After speaking with Sjoerdsma, Petitioner and Thibodeaux "discussed that they would go pick up Randy in order for Randy to buy them some beer." (Tr. 109).  According to Petitioner, Thibodeaux then stated, "we should beat his ass and leave him somewhere." (Tr. 109).  Petitioner "agreed that was something they should do." (Tr. 109).  The pair picked up Sjoerdsma and proceeded to a party store so Sjoerdsma could purchase alcohol for the group.  (Tr. 109-10).  The group then drove around drinking beer and eventually stopped on "a dirt road with no homes around." (Tr. 110).

Thibodeaux and Sjoerdsma then exited the vehicle at which point Thibodeaux began beating Sjoerdsma.  (Tr. 111-12).  It "didn't take much" for Sjoerdsma to succumb at which point Thibodeaux "stomped and kicked" him.  (Tr. 112).  Petitioner was close enough to this encounter "to hear and see everything that was going on." (Tr. 112-13).  Petitioner heard Sjoerdsma struggling to breathe.  (Tr. 113).  Thibodeaux stated, "I think he's dead" and began dragging Sjoerdsma's body into the woods.  (Tr. 113).  Thibodeaux then returned to the vehicle and informed Petitioner that they "need to get rid of him." (Tr. 113-14).  Thibodeaux took Petitioner's lighter and lighter fluid and

18

attempted to light Sjoerdsma's body on fire.  (Tr. 114-16).  Petitioner then helped Thibodeaux carry

Sjoerdsma's body back to the vehicle.  (Tr. 118).  The pair placed Sjoerdsma's body in the rear of

the vehicle and exited the area.  (Tr. 118).  The pair drove around until they reached a bridge at

which point they "threw [Sjoerdsma] over the edge" and drove away.  (Tr. 120-21).

On October 2, 2008, Ernstes obtained a DNA sample from Petitioner by swabbing

the inside of his mouth.  (Tr. 71-72).  This swab was subsequently transferred to a crime lab for

processing and analysis.  (Tr. 72).

**Fred Fay**

Fay testified that he supervised the property room at the Wayland Post of the

Michigan State Police.  (Trial Transcript, February 9, 2009, 159-60).  Fay began working at the

Wayland Post in approximately 1997.  (Tr. 161).  Fay reviewed the chain of evidence paperwork

regarding the evidence collected in the investigation of Randy Sjoerdsma's killing.  (Tr. 161-62).

Fay concluded that from 1994 through 2008, when Trooper Ernstes transported the evidence "to the

lab," the property remained properly secured in the property room.  (Tr. 162).

**Kenneth Olney**

As of March 21, 1993, Olney was employed as a Sergeant with the Michigan State

Police, Wayland Post.  (Trial Transcript, February 9, 2009, 163-65).  The evidence that was

recovered from the scene of Randy Sjoerdsma's killing was given to Olney who secured it in the

property room.  (Tr. 165-66).  Olney reviewed the chain of evidence paperwork regarding the

evidence in question and determined that there was no indication that chain of custody had been

violated or the evidence otherwise tainted or improperly accessed.  (Tr. 167).

**Joel Schultze**

As of October 17, 2008, Schultze was employed by the Michigan State Police as the supervisor of the DNA Unit at the Grand Rapids Forensic Laboratory.  (Trial Transcript, February 9, 2009, 168).  Between October 17, 2008, and January 8, 2009, Schultze performed DNA testing on a cigarette butt recovered from the scene where Randy Sjoerdsma was killed.  (Tr. 168-84). Schultze recovered DNA material from the cigarette butt in question and compared it to the DNA swab taken from the inside of Petitioner's mouth.  (Tr. 184-85).  Schultze concluded that the two DNA profiles were a match.  (Tr. 184-85).

**Daniel Dosenberry**

On March 21, 1993, Randy Sjoerdsma telephoned Petitioner.  (Trial Transcript, February 10, 2009, 38).  When Sjoerdsma offered to buy a case of beer, Petitioner agreed to come pick him up.  (Tr. 38-41).  Petitioner and Ryan Thibodeaux drove to Sjoerdsma's residence after which the group began to drive around aimlessly drinking beer.  (Tr. 41-44).  Petitioner and Thibodeaux had not devised any sort of plan to rob or assault Sjoerdsma.  (Tr. 41-42, 44-45).  After a period of time, Thibodeaux and Sjoerdsma began arguing about how "they probably wanted to kick each other's ass."  (Tr. 44).  Thibodeaux later instructed Petitioner to stop the car.  (Tr. 45). Petitioner "had a feeling" that Thibodeaux and Sjoerdsma would begin to fight, but he had not planned beforehand with Thibodeaux to assault Sjoerdsma.  (Tr. 45-46).  Petitioner likewise did not want Thibodeaux to beat Sjoerdsma.  (Tr. 46).

Once the car stopped, Thibodeaux exited the vehicle and then dragged Sjoerdsma out of the back seat.  (Tr. 47).  It "didn't take much" for Thibodeaux to "wrestle Randy to the ground" at which point Thibodeaux began "kicking and stomping on him."  (Tr. 47).  Thibodeaux later returned to the car and informed Petitioner that Sjoerdsma was dead.  (Tr. 49).  Thibodeaux then took Petitioner's lighter and lighter fluid and returned to Sjoerdsma's body.  (Tr. 50-51).  Thibodeaux returned a few minutes later and stated, "he won't burn."  (Tr. 51).  Thibodeaux and Petitioner then retrieved Sjoerdsma's body placed it in the back of the vehicle.  (Tr. 52-55).  Petitioner and Thibodeaux then drove to a bridge where they dumped Sjoerdsma's body into the water.  (Tr. 56).

Petitioner denied making the statements about which Fred McCormick testified.  (Tr. 64).  Petitioner also denied making statements to any police officers that he and Thibodeaux planned to beat Sjoerdsma and leave him somewhere.  (Tr. 62-63).  Petitioner testified that he had no intent to assault or otherwise harm Sjoerdsma on the night in question.  (Tr. 63-64).  With respect to the masturbation incident with Randy Sjoerdsma, Petitioner stated that he did not recall it because he was passed out at the time.  (Tr. 32).  Petitioner was told by others "that Randy was jacking off next to [Petitioner] on the bed."  (Tr. 32).  Petitioner was not angry about this and he did not take any action against Sjoerdsma in response.  (Tr. 33).  Petitioner "heard a couple jokes here and there" about the incident, but he "never really sat there and got teased over it."  (Tr. 38).  Petitioner "presumed" Sjoerdsma was bi-sexual, but was unconcerned that Sjoerdsma might be sexually attracted to men.  (Tr. 34).

The day after Randy Sjoerdsma was killed, Ryan Thibodeaux instructed Petitioner, "don't volunteer information."  (Tr. 28).  Thibodeaux told Petitioner, "he has done it before, he'll

do it again." (Tr. 28). Petitioner did not understand what Thibodeaux meant, but he was "afraid of Ryan Thibodeaux." (Tr. 28-29). Thibodeaux would occasionally "just walk by" Petitioner's house and "stare" just to let Petitioner "know he was always around." (Tr. 29). Thibodeaux also "done stuff" to Petitioner's property, such as slash the tires on his car. (Tr. 29-30).

**Aaron Hudson**

Hudson testified that Danielle Mullins was his first cousin. (Trial Transcript, February 10, 2009, 128-30). With respect to Mullins' reputation for truth and honesty, Hudson asserted that Mullins was "not truthful." (Tr. 130). Hudson asserted that Petitioner was "a great person" who would "give you the shirt off his back." (Tr. 131).

**Jason Smith**

Smith denied that Rob Martin ever told him that Petitioner made statements to him concerning Randy Sjoerdsma's death. (Trial Transcript, February 10, 2009, 136-37). Likewise, Smith denied ever stating to Martin that Petitioner made statements to him concerning Sjoerdsma's death. (Tr. 137).

Following the presentation of evidence, the jury found Petitioner guilty of second degree murder. (Trial Transcript, February 11, 2009, 46). Petitioner was sentenced to serve 25-40 years in prison. (Sentencing Transcript, April 28, 2009, 89). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.    The Defendant's constitutional right against
>       compelled self-incrimination was violated when the
>       trial court admitted a confession which was elicited

during a custodial interrogation without the benefit of Miranda rights.

II.  The Defendant's constitutional right to present a defense was violated when, the trial court prohibited defense counsel from presenting any testimony concerning the aggressive, assaultive and violent nature of the co-defendant, Ryan Thibodeaux, also an accused.

III.  The trial court erred by denying a motion to amend the information to include a charge of accessory after the fact.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Dosenberry*, 2010 WL 4137455 (Mich. Ct. App., Oct. 21, 2010).  Asserting the same issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal.  *People v. Dosenberry*, Case No. 142229, Order (Mich., Mar. 29, 2011).

On November 17, 2011, Petitioner filed in the trial court a motion for relief from judgment in which he asserted the following claims:

I.  Mr. Dosenberry was denied his constitutional right to effective assistance of counsel, when his trial counsel requested an improper lesser offense jury instruction of accessory after the fact, rather than a proper lesser included offense jury instruction of voluntary and/or involuntary manslaughter.

II.  Mr. Dosenberry was denied his constitutional right to effective assistance of counsel, when his trial counsel misread, misrepresented, and wasted a transcript of a conversation between defendants, which was potentially exculpatory evidence and wrongfully incriminated Mr. Dosenberry.

III.  Mr. Dosenberry was denied his state and federal constitutional rights to a trial by impartial jury, when during his trial the jury more or less heard court

23

proceedings and arguments outside the presence of the jury, from the jury room.

IV.   Mr. Dosenberry is entitled to and due process requires the correction of his Presentence Investigation Report (PSIR) that omits inaccurate and irrelevant information.

V.   Mr. Dosenberry was denied the effective assistance of appellate counsel where his appellate attorney did not raise the foregoing issues in his appeal by right.

The trial judge denied Petitioner's motion. *People v. Dosenberry*, Case No. 08-15985-FC, Order (Allegan Cnty. Cir. Ct., Dec. 20, 2011). Raising the same issues, Petitioner moved in the Michigan Court of Appeals for leave to appeal. The court denied Petitioner's request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Dosenberry*, Case No. 309050, Order (Mich. Ct. App., Apr. 11, 2012). Petitioner appealed this determination to the Michigan Supreme Court which denied relief "because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Dosenberry*, Case No. 145198, Order (Mich., Oct. 22, 2012). Petitioner initiated the present action on December 13, 2012, asserting the following claims:

I.   Petitioner's constitutional right against compelled self-incrimination was violated when the trial court admitted a confession which was elicited during a custodial interrogation without the benefit of Miranda rights.

II.   Petitioner was denied his constitutional right to effective assistance of counsel, when his trial counsel requested an improper lesser offense jury instruction of accessory after the fact, rather than a proper lesser included offense jury instruction of voluntary and/or involuntary manslaughter.

24

III.     Petitioner was denied his constitutional right to
        effective assistance of counsel, when his trial counsel
        misread, misrepresented, and wasted a transcript of a
        conversation between defendants, which was
        potentially exculpatory evidence and wrongfully
        incriminated Petitioner.

IV.      Petitioner was denied his state and federal
        constitutional rights to a trial by impartial jury, when
        during his trial the jury more or less heard court
        proceedings and arguments outside the presence of
        the jury, from the jury room.

V.       Due process requires that Petitioner not be sentenced
        on materially untrue assumptions or misinformation,
        and he is entitled to the correction of his Presentence
        Investigation Report (PSIR) omitting inaccurate and
        irrelevant information.

VI.      Petitioner was denied the effective assistance of
        appellate counsel where his appellate attorney did not
        raise in his appeal by right the issues raised by
        Petitioner in his motion for relief from judgment.

## STANDARD OF REVIEW

Dosenberry's petition is subject to the provisions of the Antiterrorism and Effective

Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court
        shall not be granted with respect to any claim that was
        adjudicated on the merits in State court proceedings unless
        the adjudication of the claim —

        (1)     resulted in a decision that was contrary to, or involved
                an unreasonable application of, clearly established
                Federal law, as determined by the Supreme Court of
                the United States, or

25

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at

411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."

27

*Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Introduction of Confession**  (Habeas Claim I)

As detailed above, several police officers testified regarding statements Petitioner made to Trooper Ernstes and Detective Werkema during a September 2, 2008 interview. Prior to

trial, Petitioner moved to suppress this evidence.  Petitioner argued that because he had not been

properly informed of his *Miranda* rights prior to the interview, introduction of the officer's testimony

violated his right to be free from compelled self-incrimination.  Petitioner's motion was denied by

the trial court and on appeal.

The Fifth Amendment provides, in part, that no person "shall be compelled in any

criminal case to be a witness against himself."  U.S. Const. amend. V.  In an attempt to secure this

right, the United States Supreme Court ultimately held that prior to custodial interrogation, an

accused must be informed of the following: (1) his right to remain silent; (2) that anything he says

may be used against him; (3) his right to have an attorney present during questioning; and (4) that

if he cannot afford an attorney one will be appointed for him.  *See Miranda v. Arizona*, 384 U.S. 436,

444 (1966)).  Because these prophylactic measures "protect the individual against the coercive nature

of custodial interrogation, they are required only where there has been such a restriction on a

person's freedom as to render him 'in custody.'"  *J.D.B. v. North Carolina*, 564 U.S. 261; 131 S.Ct.

2394, 2402 (2011) (citations omitted).

For purposes of the present analysis, the term "custody" refers to "circumstances that

are thought generally to present a serious danger of coercion."  *Howes v. Fields*, 132 S.Ct. 1181,

1189 (2012).  This is an objective inquiry which requires a court to determine whether, given the

specific circumstances surrounding the interrogation, "a reasonable person would have felt he or she

was at liberty to terminate the interrogation and leave."  *J.D.B.*, 131 S.Ct. at 2402.  While there does

not exist a defined set of factors which much be assessed in every circumstance, some of the factors

relevant to this determination include the following: (1) the location of the questioning; (2) its

duration; (3) statements made during the questioning; (4) the presence or absence of physical

restraints during the questioning; and (5) the release of the interviewee when questioning is complete. *Howes*, 132 S.Ct. at 1189. As if to underscore that this is an objective assessment, the Supreme Court has stated, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." *J.D.B.*, 131 S.Ct. at 2402.

On January 22, 2009, the trial court held a hearing on this matter at which Trooper Ernstes testified. Petitioner also presented evidence from a clinical psychologist who offered opinion evidence on the question whether an "average person" would have considered themselves to be "in custody" given the circumstances of the interview in question. After receiving testimony and argument, the trial court denied Petitioner's motion to suppress. Specifically, in relevant part, the court stated as follows:

> For the reasons I'll more fully explain on the record, it is my decision that a custodial interrogation did not take place at any time during these various interviews in September of 2008. I am applying in terms of legal principals the totality of the circumstances test, looking at all of the factors of behavior and appearance, conduct during these interviews, including the initial interview at the defendant's home, some conduct and exchange verbally in the car, then a series of transactions on video tape at the police station. I am using an objective standard in assessing all of those circumstances because I believe the law clearly mandates an objective standard. What that means is the law forecloses an examination and reliance and a decision on a Walker hearing as to subjective states of mind that the police may have harbored or that the defendant may have harbored which are not somehow or another objectively revealed in the course of these interviews.

> We had significant testimony this morning from Mr. Ernstes from the State Police. He was present for most of these interview transactions. I note as having significance in his testimony that after arriving there at the defendant's home there was a conversation in which the defendant request[ed] a desire to wait for his wife. The police did

30

wait for his wife, spoke to his wife over the phone.  That the
defendant wanted to wait for a delivery of food and the police
accommodated him in that respect.  The defendant after initially
engaging with the police went back into his home.  I attached
significance to that because it indicates at that point that he had not
only physical freedom of movement but he felt and behaved
observably in a way that evidenced his own control of his own person
and his own exercise of freedom in his movement.

There was a discussion of his schedule for getting home, and it
seemed to me the police were offering to be accommodating of his
desire to return home at about 10:00 so he'd have adequate rest.  He
later picked his choice of meal when the police were in his presence
in the car at the fast food location and that food was displayed during
the time he was in the police interview room at the police station.  At
no time was the defendant put in cuffs.  It's my finding there was no
display of cuffs or any other restraint device that would objectively
lead to some conclusion that the defendant's liberty was impaired any
significant way.  There were no weapons of any kind brandished or
even visible.  He was left alone during the interview at the police
station several times in addition to that period when he was left alone
to go back into his house before they reached the police station.  He
apparently kept possession of his cell phone and he had liberty to use
the cell phone during the period of police investigation and interview.
This whole transaction took something over 2 hours.  The figure that
comes to my mind is 2 hours and 50 minutes from time of
engagement until the time he's home, but I might have erred in a short
calculation error, but I think it was approximately 2 ½ hours.

The interview room at the police station was never locked.  He was
never put in cuffs, he was never arrested that entire day.  Neither of
the officers had any physical contact with him other than incidental
touching, and I don't frankly remember anything that hinted at any
level of aggression at all in a contact.  There were no verbalized
threats or coercion and I acknowledge that the record, the audio
accompanying the video that I watched was deficient.

I think this defendant said he was, and behaved, as if he was wil[l]ing
to go with the police and I believe he did go with the police
throughout all of these transactions, speaking to his wife before he
left.  I remember important statements in the DVD audio that was
played in the courtroom assuring him you're not going to go to jail.
Another comment to the defendant, whatever you want to do, another

31

police comment you're doing us a favor, do you want to go and we'll get a bag in reference to the food.  All of these things inviting the defendant to exercise his volition to agree or not to agree to respond physically by leaving at any time he wanted to.  There was another statement by the police officer in the second segment of the audio played where the officer says, "You're helping us out.  You're not going to jail."  That segment was occurring on I think before they left the defendant's premises.  There was a reassuring statement by one of the officers to the defendant that he could smoke, a statement that from the police to the defendant that you've got some control here. The observable material on the DVD indicates that the defendant's posture is relaxed, he eats his food, he doesn't recoil in any way signifying something observable that indicated his physical movements were restrained or that he felt threatened.

The key issue is I think really both parties have framed it, is whether these transactions at the home and in the car and at the police station constitute a custodial interview and I find they do not.  Therefore, the fact that the defendant was not read his Miranda rights is of no particular significance.  They didn't need to read him his Miranda rights unless and until the interview became custodial in character. I find from initial engagement with the defendant at his home until he returned there never was a time when that entire series of transactions could fairly be characterized as a custodial interview.

(Hearing Transcript, January 22, 2009, 122-26).

The trial court's resolution of this issue is consistent with and supported by Trooper

Ernstes' testimony.  (Tr. 25-54).  Petitioner asserted this issue on direct appeal.  The Michigan Court

of Appeals rejected this claim stating, in relevant part, as follows:

This Court cannot find and defendant does not seriously argue that the detailed fact-finding by the trial court was erroneous.  Instead, the argument focuses on whether the facts found by the court, along with other facts and circumstances presented for our review, support the court's finding that the interrogation was non-custodial.  The trial court did not err in ruling that defendant was not in custody during the September 2, 2008, police interview.  Defendant asserts that the fact that the interview occurred away from his home, after two detectives insisted that he accompany them to the police station, thereby isolating him from his support system, signified that he was

in custody.  However, the evidence showed that the detectives asked, not demanded, that defendant speak to them.  Also, defendant's statements to the detectives while at his home did not indicate that he felt any pressure to speak to them.  Rather, he voluntarily agreed to speak with them and to being transported to the station by the detectives.[3]  While the detectives' repeated offers to drive defendant to the station and to buy him dinner on the way reflect their eagerness to speak with him, their statements were actually deferential to defendant and provided him with options.

The fact that the interview took place at the police station is insufficient by itself to establish that defendant was in custody.[4] Defendant was at the station after normal hours and did not encounter any uniformed police officers.[5]  He was left alone in an unguarded interview room with the door open before the interview began and sat in the chair closest to the door while he was in the room.  Defendant retained possession of his cell phone during the entire encounter.[6] Moreover, he conceded that the detectives did not exhibit any threatening, coercive, or aggressive behavior during the interview.

Given the casual atmosphere of the interview and the detectives' repeated deference to defendant when choices needed to be made while at defendant's house and during the drive to the station, the relaxed environment at the station and during the interview, defendant's freedom of movement at all times, and his ability to use his cell phone at any time, the trial court did not err in determining that the totality of the circumstances established that defendant was not in police custody during the interview.  The fact that defendant did not have a car to drive home from the station did not affect his

---

[3]  That Petitioner did not drive himself to the interview does not advance Petitioner's position.  *See, e.g., Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003) (where suspect "voluntarily came to the police station," the "mode in which [the suspect] was transported for questioning [is] irrelevant").

[4]  This statement is consistent with Supreme Court authority.  *See, e.g., California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("we have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'").

[5]  That the officers questioning Petitioner were in plain clothes and displayed no visible weapons weighs in favor of a finding that Petitioner was not in custody.  *See, e.g., United States v. Salcedo*, 533 Fed. Appx. 796, 799 (9th Cir., July 22, 2013).

[6]  This factor weighs in favor of a finding that Petitioner was not in custody.  *See, e.g., United States v. Levenderis*, 806 F.3d 390, 400-01 (6th Cir. 2015) ("Defendant was also able to place and receive phone calls during the interviews, something a reasonable person in police custody would not feel free to do").

> ability to remove himself from the detectives' presence if he so chose. In addition, although defendant presented expert testimony on the question whether he was "in custody," because "[t]he determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by. . .the person being questioned," the trial court was justified in not giving weight to defendant's expert's testimony. Therefore, the trial court did not err in finding that defendant was not in custody for *Miranda* purposes. Accordingly, the court properly denied defendant's motion to suppress.

*Dosenberry*, 2010 WL 4137455 at *2 (internal citations omitted).

In light of the evidence and legal standard, the Court concludes that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Likewise, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue upon which habeas relief may be granted.

## II.        **Right to Fair Trial**  (Habeas Claim IV)

Petitioner argues that his right to a fair trial was denied because "during his trial the jury could hear court proceedings and arguments outside the presence of the jury, from the jury room." Respondent argues that this claim is without merit and, furthermore, has been procedurally defaulted. The Court need not address the procedural default argument because this claim clearly lacks merit.

Petitioner argues that the jury in his trial could hear, from inside the jury room, proceedings taking place in the courtroom outside of their presence. Petitioner has presented no evidence that any of the jurors hearing his trial were able to hear or otherwise discern any proceedings that were undertaken outside the jury's presence. Petitioner has submitted a brief

portion of a transcript from a completely different proceeding which he asserts supports his position. The Court, however, is not persuaded.

The transcript in question concerns a proceeding which occurred on May 5, 2008, before the Honorable Kevin Cronin.[7]  The exchange in question appears to establish that when a particular DVD was played in the courtroom it could "more or less" be heard inside the jury room. Such fails to advance Petitioner's cause, however, for several reasons.  First, while Judge Cronin conducted Petitioner's trial, there is nothing in the record establishing that Petitioner's trial was conducted in the same courtroom as the May 5, 2008 proceeding cited by Petitioner.  Also, the transcript in question does not establish that normal court activities could be heard from within the jury room, but instead only indicates that the contents of a single DVD could "more or less" be heard inside the jury room.  There is no evidence in the record indicating whether the sound quality or volume of the DVD in question was unusually loud or distinct in some way.  Thus, its relevance to Petitioner's trial is purely speculative.  Finally, the proceeding cited by Petitioner occurred nine months *before* Petitioner's trial.  There is nothing in the record supporting the conclusion that the audio problem cited by Petitioner was a systematic problem or that such had not been resolved by the time of Petitioner's trial several months later.  Accordingly, this claim raises no issue on which habeas relief may be granted.

### III.          **Due Process**  (Habeas Claim V)

Petitioner next argues that he is entitled to relief because his Pre-Sentence

---

[7]  This material is contained within docket entry #24, as an exhibit to Petitioner's application in the Michigan Court of Appeals for leave to appeal.

Information Report (PSIR) contained inaccurate information. It has long been recognized that when imposing sentence, "courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997); *see also*, *Roberts v. United States*, 445 U.S. 552, 556 (1980) (a "fundamental sentencing principle" is that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come"). As the *Watts* Court observed, "[h]ighly relevant - if not essential - to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and circumstances." *Watts*, 519 U.S. at 151-52. Sentencing courts may even consider past criminal behavior which did not result in a conviction, or for which the defendant was never tried. *See Id.* at 152. Sentences imposed on the basis of "misinformation of constitutional magnitude," however, may present grounds for habeas corpus relief. *Roberts*, 445 U.S. at 556. To obtain habeas relief, however, Petitioner must demonstrate that "the information in question was materially false and that the trial court relied on it." *Potter v. Yukins*, 6 Fed. Appx. 295, 296 (6th Cir., Oct. 9, 2007).

Petitioner has identified 25 alleged errors in his PSIR most of which concern matters about which there was conflicting evidence presented at trial. Petitioner has also identified other alleged errors which concern matters such as whether Petitioner was employed at the time of his arrest and whether or when he earned his GED. The trial court addressed these matters at great length at sentencing. Petitioner has failed to demonstrate that the court's resolution of these various disputes is erroneous or resulted in the consideration of "materially false" information. Moreover, even if Petitioner could establish that any of the alleged errors at issue were materially false, there is nothing in the record to suggest that the trial court relied on such when fashioning Petitioner's

36

sentence.  A review of the sentencing transcript makes clear that Petitioner was sentenced based upon more substantive matters than those raised in this claim.  In sum, Petitioner cannot establish that he was sentenced on the basis of "misinformation of constitutional magnitude."  The Court concludes, therefore, that this claim raises no issue upon which habeas relief may be granted.[8]

## IV.         Ineffective Assistance of Counsel  (Habeas Claims II-III and VI)

Petitioner asserts that both his trial and appellate attorneys rendered ineffective assistance.  Specifically, Petitioner asserts that his trial attorney rendered deficient performance in two respects: (1) failed to request that the jury be instructed on the lesser included offense of manslaughter; and (2) "wasted a transcript."  Respondent contends that Petitioner has procedurally defaulted these particular claims of ineffective assistance.  The Court need not address this argument, however, as these claims are without merit.  Petitioner asserts that his appellate counsel rendered deficient performance by failing to assert on direct appeal habeas claims II-V.  As discussed below, this claim is likewise without merit.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard

---

[8]  Petitioner also suggests that he is entitled to be resentenced because he received a more harsh penalty than Ryan Thibodeaux.  Petitioner has failed to properly develop this argument.  The Court nevertheless notes that Petitioner and Thibodeaux were convicted of different crimes in different proceedings.  Thibodeaux was convicted of manslaughter whereas Petitioner was convicted of second degree murder.  The distinction between these two crimes and the permissible sentences therefor is a sufficient basis for the disparity in penalty of which Petitioner complains.  Second degree murder is punishable by up to life in prison whereas manslaughter is punishable by imprisonment of not more than 15 years.  *See* Mich. Comp. Laws §§ 750.317, 750.321.  Petitioner has failed to articulate any argument that this disparity in punishment violates federal law or otherwise warrants habeas relief.  Accordingly, this argument is rejected.

of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.      Lesser Included Offense

Under Michigan law, in effect as of the date of Randy Sjoerdsma's death, the elements of second degree murder were: (1) death; (2) caused by the defendant; (3) the killing was done with malice; and (4) without justification or excuse.  *See People v. Porter*, 425 N.W.2d 514, 515 (Mich. Ct. App. 1988).  Michigan law recognized two types of manslaughter, voluntary and

38

involuntary.  *See People v. Townes*, 218 N.W.2d 136, 140 (Mich. 1974).  Both categories of manslaughter proscribed "the unlawful killing of another without legal justification or excuse and are distinguished from the higher crimes of murder by the absence of malice."  *Id.*

Murder and manslaughter were distinguishable in that murder required a showing of malice, unlike manslaughter, whereas manslaughter required a showing of provocation, which murder did not.  *See People v. Hansma*, 269 N.W.2d 504, 507 (Mich. Ct. App. 1978) ("manslaughter is distinguished from murder in that the element of malice, express or implied, which is the very essence of murder, is absent"); *People v. Pouncey*, 471 N.W.2d 346, 349-50 (Mich. 1991) ("the element of provocation which characterizes the offense of manslaughter separates it from murder").

Malice was defined as "the intent to kill, the intent to inflict great bodily harm, or acting with a wanton and willful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm."  *Poeple v. Hughey*, 464 N.W.2d 914, 918 (Mich. Ct. App. 1991).  The "provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason."  *Pouncey*, 471 N.W.2d at 350.

There was no evidence that on the night in question Petitioner acted in response to any contemporaneous provocation from Randy Sjoerdsma.  Instead, the evidence showed that Petitioner and Ryan Thibodeaux acted pursuant to a plan the purpose of which was to cause great bodily harm, the definition of malice.  In sum, the evidence did not support instructing the jury on the lesser included offense of manslaughter.  Because it would have been futile to assert this particular issue, Petitioner was not prejudiced by counsel's failure to assert such.

B.      Wasted Transcript

As previously noted, when Detective Ken Daniel testified, a recording of an interview he conducted with Petitioner was played for the jury.  A subsequent discussion revealed that there existed two different versions of the interview transcript.  (Trial Transcript, February 5, 2009, 96-100).  Specifically, Petitioner's counsel noted that Trooper Ernstes had subsequently "redacted and corrected" the original transcript "to remove and to change. . .fairly significant terms.  Like going from Ryan Thibodeaux saying if you've got to tell them I did it, you know, the expletive, to well if you're going to tell them we did it."  (Tr. 99).

Petitioner's attorney sought to have both versions of the transcript admitted into evidence.  (Tr. 99-100).  When the prosecutor objected on the ground that it was not yet clear which version of the transcript was accurate, Petitioner's counsel argued that he was entitled to introduce both versions of the transcript in question.  (Tr. 99).  While not precisely stated, it is apparent that counsel was seeking to have both transcripts admitted in support of an argument that the police modified the transcript not to make it more accurate, but to suit their own purposes in attmepting to obtain a conviction against Petitioner.  (Tr. 99-100).

Petitioner argues that his attorney "misread [and] misrepresented" the transcript and in the process "wrongfully incriminated" him.  This argument fails for two reasons.  First, the exchange in question occurred outside the presence of the jury.  (Tr. 95).  To the extent that Petitioner argues that the jury could hear what was taking place outside their presence, such argument is rejected for the reasons previously articulated.  More importantly, Petitioner's argument completely misses the point of what his attorney was attempting to accomplish.  Petitioner's attorney did not misread or misrepresent the contents of the transcript.  Instead, in recognition of the fact that

40

the police modified the transcript, in a manner which arguably inculpated Petitioner, counsel was attempting to highlight this modification for the jury in support of an argument that the police modified the transcript for improper reasons. Properly understood, counsel's action represented a reasonable strategic decision. Thus, counsel's actions were neither deficient nor prejudicial to Petitioner.

### C.      Appellate Counsel

Petitioner faults his appellate counsel for failing to assert on direct appeal habeas claims II-V. As discussed herein, however, these claims are without merit. As such, Petitioner was not prejudiced by counsel's failure to assert such.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Dosenberry's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                         Respectfully submitted,


Date:  March 7, 2016                      /s/ Ellen S. Carmody_____
                                     ELLEN S. CARMODY
                                     United States Magistrate Judge